UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RAYMOND FOOTE, SR.,
individually and as grandparent and natural
Guardian of T.F. (formerly an infant),

                              Plaintiff,

                                                          1:22-CV-0815
v.                                                        (GTS/CFH)

BOARD OF EDUCATION OF WHITEHALL
CENTRAL SCHOOL DISTRICT; WHITEHALL
CENRAL SCHOOL DISTRICT; KEITH REDMOND,
in his individual and official capacity; ETHAN
BURGESS, in his individual and official capacity;
and PATRICK DEE, in his individual and official
capacity,

                              Defendants.
_____

APPEARANCES:                                   OF COUNSEL:

FINN LAW OFFICES                               RYAN M. FINN, ESQ.
    Counsel for Plaintiff
P.O. Box 966
Albany, NY 12201

GIRVIN & FERLAZZO, P.C.                        PATRICK J. FITZGERALD III, ESQ.
    Counsel for Defendants                     SCOTT P. QUESNEL, ESQ.
20 Corporate Woods Boulevard
Albany, NY 12211-2350

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court, in this civil rights action brought by Raymond Foote, Sr.

("Plaintiff") against the Board of Education of Whitehall Central School District, Whitehall

Central School District, Athletic Director Keith Redmond, Principal Ethan Burgess, and School

Superintendent Patrick Dee ("Defendants"), is Defendants' motion for summary judgment

pursuant to Fed. R. Civ. P. 56.   (Dkt. No. 42.)   For the reasons set forth below, Defendants'

motion for summary judgment is granted and Plaintiff's Supplemental Complaint is dismissed.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Supplemental Complaint

Generally, in his "Supplemental" Complaint, Plaintiff asserts three claims.   (Dkt. No.

5.)[1]   First, Plaintiff claims that Defendants violated his right to assembly pursuant to the First

Amendment and 42 U.S.C. § 1983 by banning him from attending school sporting or other

events for the remainder of the 2021-2022 school year following an incident at a basketball game

on January 24, 2022.   (*Id.* at ¶¶ 32-41.)

Second, Plaintiff claims that Defendants violated his right to be free from retaliation for

protected speech pursuant to the First Amendment and 42 U.S.C. § 1983 when they banned him

from attending school sporting or other events after he "voiced legitimate complaints about

Defendant Redmond, his verbal abuse of students, and his retaliation after he confronted

defendant Redmond."   (*Id.* at ¶¶ 42-55.)

Third, Plaintiff claims that Defendants violated his right to due process pursuant to the

Fourteenth Amendment and 42 U.S.C. § 1983 by banning him from attending school sporting or

other events without providing him a mechanism to challenge that decision or be heard related to

that violation of his rights.   (*Id.* at ¶¶ 56-65.)

---

[1]    It appears that, when Defendants removed this action from state court on August 2, 2022,
they had not yet been served with Plaintiff's original Complaint.   (Dkt. No. 1.)   As a result. on
August 8, 2022, Defendants filed a demand for Plaintiff's Complaint.   (Dkt. No. 3.)
Apparently in response to that demand, on August 29, 2022, Plaintiff filed what he labeled as a
"Complaint" but that he dated August 29, 2022, and docketed as his "Supplemental Complaint."
(Dkt. No. 5, at 1, 9; *see* Docket Entry dated Aug. 29, 2022.)   Although the Court cannot discern
whether Plaintiff's "Supplemental" Complaint alleges events that have happened after the date of
his original Complaint for purposes of Fed. R. Civ. P. 15(d), or whether it is in fact an Amended
Complaint, the Court will assume that Plaintiff had a right to Supplement and/or Amend his

**B.      Procedural History**

Plaintiff originally filed a Summons with Notice with the Supreme Court of the State of New York, Washington County, on May 26, 2022.   (Dkt. No. 1, Attach. 1.)   Defendants filed a notice of removal to this Court on August 2, 2022, on the basis of this Court's original jurisdiction over the action related to Plaintiff's asserted constitutional claims.   (Dkt. No. 1.)

On January 30, 2023, the parties filed a signed stipulation of discontinuance related to Plaintiff's claims for punitive and liquidated damages, such that the Court dismissed those claims with prejudice by Text Order on January 31, 2023.   (Dkt. Nos. 16, 17.)   On August 30, 2023, the parties filed another stipulation of discontinuance related to substantive claims asserted by T.F. (Plaintiff's grandson, who was a minor at the time of the original filing of the Complaint) against Defendants.   (Dkt. No. 34.)   The Court construed that stipulation as a motion for leave to settle the action on behalf of an infant and ultimately closed the action, but granted a request to re-open the action based on Plaintiff Raymond Foote's desire to continue to pursue his individual claims against Defendants.   (Dkt. Nos. 35, 37, 39.)

**C.      Undisputed Material Facts on Defendants' Motion for Summary Judgment**

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises."   N.D.N.Y. L.R. 56.1(b).   This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through

_____

original Complaint once as a matter of course under Fed. R. Civ. P. 15(a)(1).

voluminous records without guidance from the parties." *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at \*6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]).   Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.'"   *LaFever*, 2021 WL 921688, at \*7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at \*2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]).   "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."   N.D.N.Y. L.R. 56.1(b).

As an initial matter, the Court notes that Plaintiff responded that he denied knowledge or information regarding many of the relevant material facts asserted by Defendants.   (Dkt. No. 50, at ¶¶ 10-14, 21-39, 41-61, 87-90, 93-94, 99, 104.)   Denying a fact solely based on a lack of knowledge as opposed to contrary evidence is insufficient to raise any genuine dispute of material fact.   *See Birchmore v. Granville Cent. Sch. Dist.*, 18-CV-1456, 2021 WL 22606, at \*1 n.3 (N.D.N.Y. Jan. 4, 2021) (Sharpe, J.) (deeming to be admissions responses to the statement of material facts in which the plaintiff asserted she lacked knowledge to admit or deny certain facts); accord *Stamm v. Onondaga Cnty.*, 17-CV-0579, 2019 WL 1004527, at \*2 (N.D.N.Y. Mar. 1, 2019) (Suddaby, C.J.).   Plaintiff further purported to deny a number of these same facts on the ground that they are inadmissible hearsay.   (Dkt. No. 50, at ¶¶ 21-39, 41, 43-61.)   However, having reviewed the content of the asserted facts, the Court is not convinced that they represent hearsay that would be so facially inadmissible as to require exclusion related to this motion; and, to the extent that any such asserted facts have not been presented here in a form that would be

4

admissible at trial, the fact that they could be later presented in such a form permits their consideration.   *See Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017) ("We need not resolve whether the documents fall within either the business-records exception or the public-records exception to the hearsay rule because, in any case, material relied on at summary judgment need not be admissible in the form presented to the district court.   Rather, so long as the evidence in question 'will be presented in admissible form at trial,' it may be considered on summary judgment.").   Lastly, Plaintiff makes multiple denials wherein he does not cite any record evidence to support such denial.   (Dkt. No. 50, at ¶¶ 20, 67-69, 95.)   This does not comply with the Court's Local Rule 56.1(b), which requires that "[e]ach denial shall set forth a specific citation to the record where the factual issue arises."   N.D.N.Y. L.R. 56.1(b). Therefore, to the extent that any of the above asserted facts that Plaintiff has not properly denied are supported by the evidence cited by Defendants, those have been deemed to be admitted for the purposes of this motion.

Applying this legal standard here, the following facts have been asserted and supported by record citations by Defendants, and either expressly admitted or denied without a supporting record citation by Plaintiff.

1.   Defendant Whitehall Central School District ("School District") is a public school district located in rural Washington County, New York.

2.   Defendant Patrick Dee is the current Superintendent of Schools for Defendant School District and has held that position since 2016.

3.   Defendant Ethan Burgess is the current Principal of Defendant School District's Junior-Senior High School and has held that position since 2020.

4. Defendant Keith Redmond is Defendant School District's Athletic Director and head coach of Defendant School District's boys' varsity basketball team and varsity baseball team; he held these positions during the relevant 2021-2022 school year.

5. On Monday, January 24, 2022, the boys' varsity basketball team was playing a game in the gymnasium of the Junior-Senior High School.

6. Neither Defendant Dee nor Defendant Burgess attended that game.

7. Defendant Redmond attended the game in his capacity as head coach of the boys' basketball team.

8. Defendant Redmond's son, Matthew Redmond ("Matthew"), who was approximately 20 years old at the time, attended the basketball game and operated the shot clock.

9. After the basketball game ended, Defendant Dee received a phone call from Defendant Redmond.

10. Defendant Redmond advised Defendant Dee that, after the basketball game had ended, Plaintiff's son, Raymond Foote Jr., who had been seated near the top of the bleachers during the game, had walked down to the gymnasium floor and over to his son, T.F. (Plaintiff's grandson), who previously was a plaintiff in this lawsuit.

11. As Plaintiff's son was speaking to T.F., Defendant Redmond told T.F. that the team was meeting in the locker room, at which point Defendant Redmond went into the locker room expecting that T.F. would follow.

12. Plaintiff's son hugged T.F. and T.F. proceeded into the locker room.

13. Once T.F. entered the locker room, Plaintiff's son began directing profane and threatening statements at Matthew, who was standing nearby.

6

14.     Plaintiff's son directed profane and threatening statements at Matthew for about a minute until Plaintiff's son was pulled away by his girlfriend.

15.     As Plaintiff's son was being pulled away from Matthew, Plaintiff, who had been standing at the top of the bleachers during the game, proceeded down to the gymnasium floor and walked over to where Matthew was standing.[2]

16.     The video evidence shows that Plaintiff and Matthew exchanged words in raised voices and that he directed profane statements at Matthew.[3]

---

[2]     Plaintiff objects to the characterization of Plaintiff's presence as "invad[ing] [Matthew's] space." (Dkt. No. 50, at ¶ 15.) Although those words are a quotation from cited evidence, the Court agrees that it is a subjective characterization that is perhaps not appropriate in light of the fact that there is video evidence of the encounter. Notably, the video evidence shows that although Plaintiff does stand seemingly within arms' length to Matthew during at least one portion of the encounter, he does not appear to touch Matthew. (Dkt. No. 42, Attach. 19, at 0:03:50-0:04:15.) Because the video evidence speaks for itself, the Court has omitted the relevant characterization from the asserted fact.

[3]     As to Defendants' asserted facts 16, 17, and 18, Plaintiff has properly disputed the characterizations contained in the evidence cited by Defendants that Plaintiff "yelled" at Matthew or that Plaintiff said "I'll be in the parking lot" during altercation. (*Compare* Dkt. No. 42, Attach. 2, at ¶¶ 16-18, *with* Dkt. No. 50, at ¶¶ 16-18.) The Court notes that, as for any implication that Plaintiff was the only person yelling, although it is difficult to tell what Plaintiff is saying on the video evidence due to poor quality audio, such evidence does establish some of the facts clearly, including that both Plaintiff and Matthew raised their voices at times during the encounter. (Dkt. No. 42, Attach. 19.) Where the video evidence provides a clear depiction of what occurred, such evidence should be taken as established fact that may not be disputed by contrary evidence from the parties' affidavits. *See Scott v. Harris*, 550 U.S. 372, 378-79 (2007) (finding that court of appeals should not have relied on the plaintiff's version of events when denying summary judgment because that version was "so utterly discredited by the [video] that no reasonable jury could have believed him").

         As to Plaintiff's assertion that he did not make any profane statements, he states in his declaration that he did not direct any profane statements towards Matthew; but that statement it contradicted by his deposition testimony, in which he stated that he said, "Well, really, your father sucks as a fucking coach too, and he's always sucked, and he's always going to suck because he won't go and listen to anybody or watch any other games," and that he "talked about his father and his coaching all the way to the door." (Dkt. No. 42, Attach. 4, at 31-32.) Plaintiff cannot create a dispute of fact to defeat a summary judgment motion by asserting a fact in a declaration that contradicts his earlier deposition testimony. *See Guerra v. Swanstrom*,

17.     After Plaintiff exited the gymnasium, he stood in the doorway and continued to make comments to Matthew and others.

18.     After Plaintiff exited the gymnasium, a chaperone asked Plaintiff to leave the area and Plaintiff refused to do so.[4]

19.     Matthew subsequently reported the conduct of Plaintiff and Plaintiff's son to Defendant Redmond.

20.     Defendant Redmond later told Defendant Dee that, upon hearing what had happened to Matthew, he was concerned for their safety and asked assistant coach Neil Molinaro (who is Plaintiff's son-in-law) and another community member to walk them to their cars.

21.     Defendant Redmond later told Defendant Dee that Plaintiff and Plaintiff's son were not in the parking lot when he exited the Junior-Senior High School.

22.     Defendant Redmond later told Defendant Dee that, when he arrived home, he called the Washington County Sheriff's Department because of the statements that had been made by Plaintiff and Plaintiff's son.

23.     During discovery, Plaintiff produced a report from the Washington County Sheriff's Department which shows that the Sheriff's Department contacted Plaintiff about his

---

21-CV-0459, 2023 WL 5528721, at *8 (N.D.N.Y. Aug. 28, 2023) (Kahn, J.) (stating that "it has long been the law in the Second Circuit that a party may not avoid summary judgment by submitting a declaration in opposition to summary judgment that contradicts his sworn deposition testimony").   As a result, the portion of this fact related to whether Plaintiff directed any profane statements towards Matthew is deemed to have been admitted to the extent it is supported by the evidence.

[4]     Plaintiff denies this asserted fact, but cites no evidence to support that denial.   (Dkt. No. 50, at ¶ 20.)   The only apparent evidence Plaintiff has submitted that would address this matter is a paragraph in his declaration in which he denies that he "disobeyed a chaperone," stating that he "was asked to wait down the hall and I said 'I'll stay here.'"   (Dkt. No. 50, Attach. 2, at ¶ 13.) However, this evidence supports the asserted fact, as Plaintiff admits he was asked to leave the area of the gymnasium door and refused.   This asserted fact is therefore deemed to be admitted.

behavior after the basketball game.

24.     After Defendant Redmond told Defendant Dee what had happened, Defendant

Dee directed Defendant Redmond to obtain statements from witnesses in Defendant Redmond's

capacity as Defendant School District's Athletic Director.

25.     Defendant Redmond subsequently contacted several individuals who he

understood to be witnesses to the interaction between Plaintiff, Plaintiff's son, and Matthew, and

asked them to provide statements.

26.     Defendant Redmond also obtained a statement from Matthew.

27.     Defendant Redmond began receiving witness statements by email on the evening

of January 24, 2022, which he forwarded to Defendants Dee and Burgess.

28.     Defendant Redmond received additional witness statements on January 25, 2022,

which he also forwarded to Defendants Dee and Burgess.

29.     Defendants Dee and Burgess reviewed the statements that were forwarded to

them from Defendant Redmond.

30.     The statement of Matthew was as follows:

> After the basketball game the team was heading to the locker room.
> [T.F.'s] father quickly came over to the bench and started talking to [T.F.].
> Once everyone was in the locker room and [T.F.] was still talking to his
> father and my dad told [T.F.] "let's go" to go in the locker room to talk
> about the game.   This has been the routine for as long as I can remember.
> After they enter the locker room [T.F.]'s dad looked at me and said "Why
> is your dad such a dick. Why can't I talk to my son[?]"   I then explained
> to him that this is the routine, and they will be out in a minute.   After you
> lose you go in the locker room and talk about the game.   That wasn't
> good enough for him.   He then went on about how much my dad is a
> terrible coach and makes terrible decisions about playing time etc.   I then
> explained to him that I have nothing to do with it and if he has a problem
> to talk to him not me and then I explained I was done talking to him.   He
> then proceeded to call me every name in the book and that I was "just like

my father" and at one point said "I'll wait for you in the parking lot."
After this, he called me "a piece of shit" one last time and then slammed
the doors exiting the gym.   Then [T.F.]'s grandfather came over and
continued yelling at me.   I then just kept trying to end the conversation
and tell him if he has a problem to take it up with my dad.   Again, not a
good enough answer and he continued to yell about [T.F.]'s playing time
and other problems.   I kept telling him I'm done talking to him and tried
to walk away.   He finally walked away and as he was leaving said "he
only plays his favorite players, that's why you played so much. I'll be in
the parking lot."   He then stood in the hallway waiting for me and[/]or my
father but left before we came out.

31.     The statement of Marsha Ross was as follows:

I was chaperoning the boys basketball game on January 24th and the game
was over and the spectators were leaving and I hear yelling, I looked into
the gym and [Plaintiff] ([T.F.]'s grandfather) was yelling at Matt
Redmond, then he ([Plaintiff]) went into the hall with his wife started to
leave and then came back down the hall and I asked him to please leave,
he started to leave and then started walking down the hall towards the
lobby again I asked him to please leave and he made a comment about "he
treats my grandson just like he treated my son" again I said could you just
wait outside and at the time Rick Whiting came and said let's go, she
asked you to leave and pretty much escorted him out.   He also made a
comment about seeing Pat Dee tomorrow and that Matt was just like his
father.

32.     The statement of Shea Whiting was as follows:

I was a parent attending the game-not as a chaperone
The game was over and the coach and boys were in the locker room.

My attention was drawn when I heard the gym door slammed open loudly
by Ray Foote (Junior).   At that point I looked over to the space in front of
the locker rooms.   I saw [Plaintiff] yelling at Matt Redmond.   I could not
hear all of what was said.   Below are the quotes I did hear [Plaintiff] say.
"You're a piece of shit. You're just like your father" (to Matt)
"That's the only reason you got the playing time you did, Matt!"
[Plaintiff] walked out of the gym continuing to yell at Matt as he left.   I
thought he had left the building; however, when I looked over to Mrs.
Ross (the chaperone) I noticed [Plaintiff] was standing over there (not
wearing his mask).

I walked over to Mrs. Ross since she was standing alone.   When I arrived
near Mrs. Ross, [Plaintiff's] wife was trying to get him to leave.   I asked

Mrs. Ross if she had already asked him to leave and she said, "yes, more than once." He said, "I'm waiting for my grandson." Mrs. Ross said "you can wait for him down there" (indicating the end of the hallway by the pool door) to which he responded, "How about I wait for him right here."

At this point, my husband came over and spoke to [Plaintiff] explaining that he understood that he was upset, but that he was making it worse. The gist of what [Plaintiff] said was that Keith didn't like [Plaintiff] and didn't play Ray Jr. and now doesn't like Ray Jr. and was doing the same thing and not playing [T.F.]. My husband continued to explain that if he didn't leave, the police were going to be called to make him leave and he should just leave. Eventually my husband got him to walk down the hall and out of the building.

33.    The statement of James Burgey was as follows:

Hi Keith,
You asked me earlier to send you my observations from last night's incident. I could not understand much. I was across the gym on the bleachers and, as my wife can attest, my hearing is awful (too many years of rock bands and steamboat whistles).

I was talking to my daughter at the conclusion of the game when I heard someone shout, "… fucking douchebag." When I heard that, I looked up to see Ray Jr. confronting Matt Redmond. I heard someone shouting but I am uncertain as to what was said. It was clear that Ray was agitated. Then Ray Jr. yelled something and left.

I then saw [Plaintiff] approach Matt. He was turned away from me so I couldn't hear what he said. But, Matt was facing my direction and I heard Matt say "just calm down." [Plaintiff] started to leave. He was yelling something as he was leaving, but I couldn't understand it. I walked over to Nicole Egan to ask her what was said.

By the time my son came out of the locker room (last one as usual), everyone had left the building.

[T.F.] was visibly upset. I approached him and gave him a hug and assured him that this incident wasn't his fault and that I know exactly how he feels as I was in the exact same situation when I played ball. I told him that I felt bad for him and I felt bad for Matt as they were both caught in the middle of an adult issue.
I told him that I wished that things could have been handled differently . . . but sports are very emotional and sometimes those emotions get the better

of us.

Then [Mr. Burgey's son] finally came out of the locker room.   I told them, "boy, you guys played like garbage!"   He and [T.F.] and I laughed a bit and then we went home.

34.   The statement of Troy Austin was as follows:

So last night at the game I was standing over by near half court and my friend [name redacted] told me to look over and I looked over and Ray [Foote] [Jr.] was arguing like pointing his finger at [M]att and I was all confused at first and then He started backing up towards half court and I started hearing him swearing and saying I'm not going to listen to what you have to say and I don't wanna fucking listen to what you have to say then [M]att said that he didn't wanna talk and to just leave him alone and he just kept saying stuff and then Alya grabbed onto [R]ay [Jr.] and I was also about to try to walk over to get them out of the gym as Ayla was also doing the same.   But then [R]ay [Jr.] when he was going out of the gym said [M]att I will be in the parking lot come outside and meet me there you don't want it.   Then he walks out and [T.F.]'s grandpa starts going up to the score table and saying stuff to [M]att how he is a douche bag just like his father and how 17 years ago Redmond did the same thing to [R]ay and he has always been a fucking douche and how [M]att only ever played because you were the coach and how he never belonged even on the starting team because he said he was shit and then he walked out the gym and just kept coming back saying stuff to [M]att by opening the door and then [name redacted]'s dad went over and started getting pissed and got him out to the parking lot there was more said during both arguments just hard to hear.

35.   In addition to reviewing the witness statements that were forwarded to them by Defendant Redmond, Defendants Burgess and Dee reviewed surveillance video with audio of the event that occurred after the basketball game.

36.   The video recording provided Defendants Dee and Burgess with a clear view of Plaintiff's conduct.

37.   After reviewing the witness statements and the surveillance video, Defendant Burgess sent a letter to Plaintiff on January 25, 2022, which stated as follows:

This letter serves as your official notification that your privileges for

Wednesday's athletic event have been revoked.   As of right now, you will not be permitted on campus January 26th and pending further investigation this ban may be extended into the future.

You are receiving this notification because of the behaviors displayed at the boy's [sic] varsity basketball game on January 24th.   I am in receipt of multiple complaints of your unbecoming behavior directed towards members helping with said varsity game.   The Superintendent, Mr. Dee is furthering the investigation and his office will be in touch with you should your ban to campus be extended.

Should you have questions please feel free to contact me.

38.     After Defendant Burgess sent this letter, Plaintiff called to ask why he was being "punished."

39.     Defendant Burgess explained to Plaintiff that Defendant School District restricted his access to school events because he engaged in disruptive, profane and threatening behavior after the basketball game in the presence of students, parents, and community members.

40.     While speaking with Defendant Burgess, Plaintiff questioned why Defendant Redmond was allowed to continue working for Defendant School District and was not being punished as well.

41.     Defendant Burgess subsequently spoke with Defendant Dee about his conversation with Plaintiff.

42.     On January 26, 2022, Defendant Dee sent a letter to Plaintiff by certified mail that stated as follows:

It has been brought to my attention that your behavior at the January 24, 2022 Whitehall Central boys basketball game, you violated not only district policy, but also Section II NYSPHSAA Guidelines for appropriate behavior.

It is reported that following the game you approached a district staff yelling at him and cursing the individual out about the individual's father as well as your grandsons [sic] playing time and that the only reason that

13

the staff member ever played was because the coach "only plays his favorite players, that's why you played so much."   The staff member repeatedly told you that you should discuss your concerns with the coach but you continued to accost the staff member finally stating that you would "be in the parking lot."   As a direct result of your behavior and actions inside the building, law enforcement needed to be contacted.

As a result of your actions, I am hereby banning you from attendance at any school event or activity for the remainder of the 2021-2022 school year.   This will include any and all athletic contests on the Whitehall Campus as well as any contests in which Whitehall Student Athletes participate.   Should you need to be on Whitehall campus for any academic reason involving your grandchild, you will be required to obtain prior approval from the building principal, sign in with the main office and be escorted to your scheduled appointment.

Understand that the reported behavior is grossly inappropriate and unacceptable in any educational setting for any reason.   If you violate the terms outlined in this letter, the police will be contacted and you will be subject to arrest for trespass.   Should there be further issues or incidents of similar circumstance in the future, you will face a permanent ban from district properties as well as additional sanctions from Section II Athletics.

Should you have any further questions or concerns regarding this letter of my determination, you are welcome to contact my office at 518-499-1772 to schedule an appointment through my administrative assistant, Mrs. Morcombe.

43.     Defendant Dee sent a nearly identical letter to Plaintiff's son on January 26, 2022.

44.     The U.S. Postal Service Return Receipt form signed by Plaintiff indicates that he did not receive Defendant Dee's letter until February 2, 2022.

45.     Plaintiff spoke to Defendant Burgess several times in the days and weeks after January 24, 2022.

46.     When Plaintiff spoke with Defendant Burgess after January 24, 2022, he continued to ask why Defendant School District continued to employ Defendant Redmond and why Plaintiff had been punished when Defendant Redmond was not.

14

47.     Defendant Burgess subsequently spoke with Defendant Dee about his conversations with Plaintiff.

48.     Defendant Dee told Defendant Burgess that he was willing to join a meeting with Defendant Burgess and Plaintiff to discuss the decision embodied in Defendant Dee's letter of January 26, 2022.

49.     Defendant Burgess encouraged Plaintiff to contact Defendant Dee, including one conversation where Defendant Burgess told Defendant that "Superintendent Dee is waiting for your call."

50.     Plaintiff left voicemail messages for Defendant Dee's administrative assistant Heather Morcombe, who also serves as the District Clerk.

51.     Plaintiff did not speak with Ms. Morcombe when he called Defendant School District.

52.     Ms. Morcombe advised Defendant Dee that she had received voicemail messages from Plaintiff.

53.     Ms. Morcombe advised Defendant Dee that, in those voicemails, Plaintiff expressed an interest in speaking with Defendant Dee about T.F.'s playing time on the basketball team, and Plaintiff's belief that Defendant Redmond should not be employed by Defendant School District.

54.     Plaintiff left multiple similar messages on Ms. Morcombe's voicemail in March or April of 2022, the receipt of which Ms. Morcombe relayed to Defendant Dee.

55.     Defendant Dee did not return Plaintiff's calls because he was prohibited from speaking with Plaintiff about T.F. since Plaintiff is not the parent or legal guardian of T.F.,

pursuant to the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g.

56.     Defendant Dee also did not return Plaintiff's calls because he was prohibited from discussing Defendant Redmond's employment with Plaintiff.

57.     At a certain point in March or April of 2022, Plaintiff stopped leaving voicemail messages.

58.     Plaintiff was allowed to attend all School District events during the 2022-2023 school year.

59.     T.F. was a member of Defendant School District's basketball team for the 2022-2023 school year.

60.     Plaintiff attended T.F.'s basketball games during the 2022-2023 school year without any incidents being reported to Defendant School District.

61.     Plaintiff was allowed to attend, but did not attend T.F.'s tennis matches when T.F. was a member of Defendant School District's tennis team during the 2022-2023 school year.

62.     T.F. graduated from Defendant School District at the end of the 2022-2023 school year.

63.     There is no current restriction on Plaintiff's ability to attend or participate in School District events.

64.     Defendant Dee noted in his letter of January 26, 2022, that Plaintiff's conduct on January 24, 2022, had violated district policy, although he did not state which specific policies.

65.     However, Defendant Dee has stated that, by his reference to Plaintiff's violation of district policy, he was referring to District Policy No. 3410, *Code of Conduct on School Property*, which prohibits visitors on school property from engaging in uncivil or disrespectful

16

treatment of District personnel and making threats of violence.

66.     He was also referring to District Policy 3412, *Threats of Violence in School*, which states that "[t]hreats of violence against students, school personnel and/or school property will not be tolerated whether such threats occur on school grounds or during the school day."

67.     District Policy No. 3412 states that "[a]ny person who commits an act or threatens an act of violence . . . is subject to appropriate discipline in accordance with applicable law, District policies and regulations, as well as the *Code of Conduct on School Property* . . ."

68.     District Policy No. 3412 further states that "the District does not condone acts and/or threats of violence which threaten the safety and well-being of staff, students, visitor and/or the school environment.   Employees, students, agents, and invitees must refrain from engaging in threats or physical actions which create a safety hazard for others."

69.     Plaintiff was aware of the fact that Defendant School District had policies in place on January 24, 2022, concerning the conduct of attendees at school events.

70.     Plaintiff has read Defendant School District's policies concerning the conduct of attendees at school events.

71.     Defendant Dee noted in his letter of January 26, 2022, that Plaintiff's conduct also violated the rules of the New York State Public High School Athletic Association ("NYSPHSAA").

72.     Defendant School District is a member of NYSPHSAA.

73.     As a member of the NYSPHSAA, Defendant School District had an obligation to address Plaintiff's inappropriate behaviors after the basketball game.

74.     NYSPHSAA Rule 28(c)(1) states "[s]pectators are expected to 'Be Loud, Be

Proud, and Be Positive.'   Negative comments and inappropriate behaviors by spectators are

required to be addressed by all and any school supervisors and administrators, as a member of

NYSPHSAA.   Spectators may be prohibited from attending current and future interscholastic

contests based on their behavior."

75.     Under the NYSPHSAA *Code of Ethics*, "it is the duty of all concerned with high

school athletics . . . to show cordial courtesy to visiting teams and officials."

76.     In response to an interrogatory that asked Plaintiff to "[s]et forth the facts that

show that Defendants' decision to revoke Plaintiff's privilege(s) to attend public events at the

district was not viewpoint-neutral," Plaintiff offered the following response:

> Defendant Keith Redmond has had a vendetta against plaintiff for over 20
> years dating back to when plaintiff opposed defendant Redmond's
> mistreatment of one of his players (Jason Brown).   See Complaint ¶¶
> 13-21.   When R.F.'s son got in a verbal altercation with Redmond's son
> at a game on January 24, 2022, RF asked what was going on and then
> opined that defendant Redmond was a terrible coach.   Defendant
> Redmond, as Athletic Director of the School, called the police after stating
> "Wait till you see what I have in store for these two."   See also responses
> 2 and 3 above.

77.     In response to an interrogatory that asked Plaintiff to "[s]et forth facts that show

that Defendants' decision to revoke Plaintiff's privilege(s) to attend public events at the District

was not reasonable," Plaintiff stated, "See 3, 4, 5 above."

78.     In response to an interrogatory that asked Plaintiff to "[s]et forth facts which show

that Defendants violated Plaintiff T.F.'s rights under the First Amendment [and Fourteenth

Amendment] to the United States Constitution," Plaintiff stated as follows:

> Defendants did not have a legitimate basis under the Constitution to ban
> plaintiff from a public place.   He was not threatening and posed no threat
> to anyone.   The "ltr whitehall blacklisting" documents clearly show that
> the School District decided, for itself, what it would do in contravention of
> the constitution, as there is no basis to ban plaintiff from school, especially

without a hearing.   A jury can infer what is or is not an attempt to chill speech and this issue presents a fact issue for the jury to decide (though the lack of hearing itself is a legal issue we intend to move for summary judgment as it is clear the school deprived plaintiffs due process).   It is noteworthy that the School has the legal duty to offer and provide an opportunity to be heard without any demand (verbal or written).

79.     Defendant Dee was not aware of any concerns Plaintiff may have had about Defendant Redmond before January 24, 2022.

80.     Plaintiff did not raise any concerns to Defendant School District about T.F. during the 2020-2021 school year.

81.     Plaintiff did not raise any concerns to Defendant School District about T.F. before the 2020-2021 school year.

82.     Defendant Dee did not know about any issues or disputes between Plaintiff and Defendant Redmond before he issued his letter of January 26, 2022.

83.     Plaintiff's son played on Defendant School District's basketball team in or around 2007.

84.     As of January 26, 2022, Defendant Dee knew that T.F. remained a member of the basketball team and Defendant Redmond remained the basketball team's coach.

85.     As of January 26, 2022, Defendant Dee knew that T.F. was previously a member of the baseball team, that Defendant Redmond was the coach of the baseball team, and that the baseball team would begin holding try-outs, practices, and games in the spring.

86.     Defendant Dee assumed that Plaintiff would attend T.F.'s basketball and baseball games in winter/spring 2022, and that Defendant Redmond would be there as the coach, which could cause Plaintiff to become more disruptive and possibly violent at future events.

87.      Defendant Dee's decisions and actions taken in relation to Plaintiff, as embodied

by Defendant Dee's letter of January 26, 2022, were solely based on the reports of Plaintiff's
conduct on January 24, 2022.

88.   Plaintiff has never been the legal guardian of T.F.

89.   Plaintiff spoke to Defendant Burgess several times in the days and weeks
following the letters he received from Defendants Burgess and Dee.

90.   In response to an interrogatory that asked Plaintiff to "set forth the facts which
show that Plaintiff's privilege(s) to attend public events at the District were revoked pursuant to
a policy or custom of the Whitehall Central School District," Plaintiff responded that "[t]he
decision was made by School officials (the Athletic Director, the Principal and the
Superintendent) who set school policy and customs as high ranking officials."

91.   In response to an interrogatory that asked Plaintiff to "[s]et forth the facts which
show that Redmond had the authority to independently or finally promulgate any policy of the
District concerning the revocation of the privilege to attend public events at the District,"
Plaintiff stated "[w]e do not believe he had the independent authority to do so."

92.   In response to an interrogatory that asked Plaintiff to "[s]et forth the facts which
show that Burgess had the authority to independently or finally promulgate any policy of the
District concerning the revocation of the privilege to attend public events at the District,"
Plaintiff stated it was "[b]ecause he wrote a letter stating plaintiff was banned."

93.   In response to an interrogatory that asked Plaintiff to "[s]et forth the facts which
show that Dee had the authority to independently or finally promulgate any policy of the District
concerning the revocation of the privilege to attend public events at the District," Plaintiff stated
it was "[b]ecause he wrote a letter stating plaintiff was banned."

94.     Defendant Redmond did not take part in Defendant Dee's decision to prohibit Plaintiff from attending extracurricular events for the remainder of the 2021-2022 school year.

95.     In response to interrogatories that asked Plaintiff to "[s]et forth the facts which show that Defendant Keith Redmond was personally involved in the decision to revoke Plaintiff's privilege(s) to attend public events at the District" and to "[s]et forth the facts which show that Defendant Keith Redmond's actions as alleged in the Complaint violated clearly established law," Plaintiff stated as follows:

> Comparing what happened in the complaint and outlined in 3, 4, and 5 above, to the facts of *Johnson v. Perry* leads to the inescapable conclusion that defendants violated clearly established law.   With regard to Redmond specifically, he was the Athletic Director and had the vendetta with plaintiff, so a jury can certainly infer that his opinion and recommendations had heavy influence and were a cause of the unlawful ban.   We also reserve our rights to argue any additional facts after taking depositions of defendants."

96.     In response to an interrogatory that asked Plaintiff to "[s]et forth the facts which show that Defendant Ethan Burgess' actions as alleged in the Complaint violated clearly established law," Plaintiff stated as follows:

> Comparing what happened in the complaint and outlined in 3, 4, and 5 above, to the facts of *Johnson v. Perry* leads to the inescapable conclusion that defendants violated clearly established law.   With regard to Burgess in particular he authored the first letter to plaintiff banning him from school grounds without any due process and without a lawful basis.

97.     In response to an interrogatory that asked Plaintiff to "[s]et forth the facts which show that Defendant Ethan Burgess' actions as alleged in the Complaint violated clearly established law," Plaintiff stated as follows:

> Comparing what happened in the complaint and outlined in 3, 4, and 5 above, to the facts of *Johnson v. Perry* leads to the inescapable conclusion that defendants violated clearly established law.   With regard to Dee in particular he authored the second letter to plaintiff banning him from

school grounds without any due process and without a lawful basis.

98.    Plaintiff has never spoken with Defendant Redmond about T.F.

99.    Plaintiff did not directly interact with Defendant Redmond on January 24, 2022.

100.    Plaintiff did not communicate with Defendant Burgess about Defendant Redmond during the 2021-2022 school year at any time before January 24, 2022.

101.    Plaintiff's son threatened Matthew when he said, "you want to find out who a tough guy is, so let's go across the parking lot and we'll see who the tough guy is."

102.    Plaintiff raised his voice while interacting with Matthew on January 24, 2022.

103.    Plaintiff did not attempt to contact Defendants Dee or Burgess by email or U.S. Mail.

**D.    Parties' Arguments on Defendants' Motion for Summary Judgment**

**1.    Defendants' Memorandum of Law**

Generally, in support of their motion, Defendants make five arguments.   (Dkt. No. 42, Attach. 1.)   First, Defendants argue that Plaintiff has failed to show that they violated his rights to assembly or free speech under the First Amendment.   (*Id.* at 15-23.)   Specifically, Defendants argue the following: (1) Defendants' ban of Plaintiff from school events did not violate his right to assembly because (a) the video and other evidence shows that his behavior at the basketball game on January 24, 2022, presented a clear and present danger and threat to safety at both that event and future events, and (b) notwithstanding any such danger, the restriction was both reasonable under the circumstances and viewpoint neutral given that it was based upon the fact that his conduct violated district and NYSPHSAA policies regarding uncivil conduct and threats of violence and there is no evidence to support that the decision was made

22

based on any unsubstantiated animus Defendant Redmond had toward Plaintiff; and (2) Defendants' ban was not retaliation for Plaintiff's exercise of his free speech rights because Plaintiff has presented no admissible record evidence establishing that he expressed any viewpoint that impacted Defendant Dee's decision to impose the ban.   (*Id.*)

Second, Defendants argue that Plaintiff has similarly failed to show that his right to due process under the Fourteenth Amendment was violated for the following reasons: (1) there is no general constitutional right to access school property; (2) Plaintiff is not the legal guardian of T.F. and so does not have a fundamental right to make decisions regarding the care, custody, or control of T.F.; and (3) as to the alleged violation of his First Amendment rights, post-deprivation due process was appropriate under the exigent circumstances of the case (i.e., the fact that future basketball games were scheduled soon after January 24, 2022) and the evidence presented substantiates that Plaintiff was afforded the opportunity to be heard about the restriction in the form of statements by Defendants Dee and Burgess that Plaintiff should contact them if he had any questions regarding the decision and the fact that Plaintiff did indeed speak to Defendant Burgess on numerous occasions.   (*Id.* at 23-25.)

Third, Defendants argue that Defendants School District and Board of Education cannot be held liable for the conduct of the other Defendants under 42 U.S.C. § 1983 because Plaintiff's theory merely seeks to hold those Defendants liable for the actions of others without establishing that the denial of the alleged constitutional rights was the result of some official custom or policy of Defendants School District and Board of Education.   (*Id.* at 25-27.)   They further argue that Defendants Dee and Burgess are not final policymaking authorities as they would be required to be in order for the Court to treat their decisions as an official policy of the District.   (*Id.*)

23

Fourth, Defendants argue that Plaintiff cannot hold Defendants Burgess or Redmond liable under 42 U.S.C. § 1983 because the evidence does not raise even a genuine dispute of material fact to show that they were personally involved in the alleged constitutional deprivations, because (1) Defendant Redmond's only involvement was to collect witness statements regarding Plaintiff's conduct at the basketball game on January 24, 2022, and to send those statements to Defendants Dee and Burgess, and (2) Defendant Burgess' only involvement was to review witness statements sent by Defendant Redmond, discuss what the response should be with Defendant Dee, issue (at Defendant Dee's direction) the one-game restriction subject to further review by Defendant Dee, and to speak with Plaintiff about the temporary suspension. (*Id.* at 27-29.)   Defendants further argue that, although Plaintiff has alleged that Defendant Redmond had a "vendetta" against him and that he influenced the decision to implement the ban because of that malicious motive, there is no evidence to substantiate such speculation.   (*Id.* at 28-29.)

Fifth, Defendants argue that, even if they are found to have violated any of Plaintiff's constitutional rights, they are entitled to qualified immunity because their actions did not violate clearly established law.   (*Id.* at 29-31.)

## 2.   Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendants' motion, Plaintiff makes five arguments.[5]   (Dkt.

---

[5]   The Court notes that Plaintiff's response memorandum of law does not contain a signature by Plaintiff's attorney of record as required by Fed. R. Civ. P. 11(a).   *See* Fed. R. Civ. P. 11(a) ("Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name . . . [and] must state the signer's address, e-mail address, and telephone number."); *see also* N.D.N.Y. L.R. 10.1(c)(2) (requiring that "[e]ach document must identify the person filing the document [which includes] an original or electronic signature of the attorney or *pro se* litigant; the typewritten name of that person; the address of a pro se litigant, including zip code; and the bar roll number, office address, telephone number, and e-mail address of the attorney").   This memorandum was filed as an attachment to

No. 50, Attach. 1.)   First, Plaintiff argues that there are issues of fact that prevent summary judgment, specifically regarding Plaintiff's conduct at the basketball game on January 24, 2022, such as whether he engaged in any threats or profanity against Matthew or others or caused a disruption, and whether the actions taken against him by Defendants were both reasonable and viewpoint neutral.   (*Id.* at 5-10.)   Plaintiff more specifically argues that there is at least a question of fact regarding whether Defendant Redmond's animosity towards him stemming from Plaintiff's protected speech of disagreeing with his methods as a coach resulted in Plaintiff being banned from school events and that, even if Defendant Dee did not have knowledge of Defendant Redmond's hostility at the time he implemented the ban, Defendant Redmond's improper motive still influenced the decision in a manner that would make the decision-maker Defendants liable under a "cat's paw" theory of liability.   (*Id.*)

Second, Plaintiff argues that he has properly shown at least a genuine dispute of material fact regarding his due process claim, specifically arguing the following points: (a) contrary to Defendants' arguments, some courts have found that a grandparent possesses a liberty interest in sustaining and nurturing a relationship with a grandchild, particularly where, as here, T.F. lived with Plaintiff at the time in question; and (b) Plaintiff has shown that he repeatedly attempted to be permitted the opportunity to be heard, but was denied, and he argues that cursory statements

---

Plaintiff's response to Defendants' motion for summary judgment, which response does contain a signature, but even that signature notably does not include counsel's email address as required by Fed. R. Civ. P. 11(a).   The Court notes, however, that this Court's General Order 22 indicates that "[d]ocuments filed under an attorney's PACER username and password shall constitute that attorney's signature for purposes of the Local and Federal Rules of Civil and Criminal Procedure, including but not limited to Rule 11 of the Federal Rules of Civil Procedure.   *See* N.D.N.Y. General Order 22 § 3.3.   Because it appears Plaintiff's representative filed the response memorandum of law using his PACER account, the Court finds that there is no basis to strike that memorandum despite his failure to append a proper signature.   Counsel is however respectfully reminded of the obligation to be familiar with and comply with the requirements of the Federal and Local Rules of Civil Procedure when filing documents with this Court.

that Plaintiff was free to contact Defendants Dee and Burgess cannot insulate them from being found to have failed to provide adequate due process.   (*Id.* at 10-11.)

Third, Plaintiff argues that Defendant School District can be held liable for the actions of Defendant Dee (as the highest-ranking school official and the person who ultimately implemented the ban) because his actions represented official municipal policy and Defendant School District both ratified and condoned the actions of its employees here, and because Defendant School District's policies related to spectator behavior at school sporting events do not specifically provide for a hearing or meaningful opportunity to be heard and therefore enshrine the very unconstitutional practices that harmed Plaintiff.   (*Id.* at 11-12.)

Fourth, Plaintiff argues that Defendants Burgess and Redmond were both personally involved in the alleged constitutional violations because Defendant Redmond's actions based on his own longstanding personal animosity against Plaintiff were "the main instigator" in recommending the ban, and Defendant Burgess, despite being aware of Defendant Redmond's animosity towards Plaintiff, failed to inform Defendant Dee of that fact and failed to provide Plaintiff an opportunity to be heard.   (*Id.* at 12-13.)

Fifth, Plaintiff argues that Defendants have not established entitlement to qualified immunity because *Johnson v. Perry*, 859 F.3d 156 (2d Cir. 2017), effectively establishes the right to not be excluded from a public sporting event due to viewpoint differences or potential annoyances. (*Id.* at 13-14.)

### 3.  Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants make six arguments.   (Dkt. No. 55.)   First, Defendants argue that Plaintiff has failed to comply with this Court's Local Rule

56.1 in multiple respects and, as a result, many of the facts asserted in Defendants' Statement of

Material Facts should be deemed to have been admitted.   (*Id.* at 6-9.)   They also argue that the

Court should disregard Plaintiff's declaration because it was not sworn upon penalty of perjury

and therefore cannot constitute sufficient evidence to oppose Defendants' motion.   (*Id.*)

Second, Defendants argue that Plaintiff has failed to sufficiently show that any of the

Defendants violated his rights under the First Amendment because the video evidence of the

interaction between Plaintiff and Matthew unequivocally establishes that Plaintiff got close to

Matthew, raised his voice, used profanity, and failed to stop after Matthew repeatedly told him

he did not want to talk any further, and that Plaintiff refused to move away from the gymnasium

door when asked to do so by a chaperone, and thus there is no genuine issue of material fact that

Defendants had a reasonable basis to believe that Plaintiff's actions violated District and

NYSPHSAA conduct policies.   (*Id.* at 9-12.)   Defendants further argue that there is no evidence

to show that the ban was anything but viewpoint neutral because there has been no evidence

presented to substantiate a finding that the decision was based on any animosity by either

Defendant Redmond or the other Defendants related to Plaintiff's statements that Defendant

Redmond is a terrible coach.   (*Id.* at 12-14.)

Third, Defendants argue that Plaintiff's due process claim also must fail as a matter of

law because (a) case law in this circuit generally agrees that there is no constitutional right of a

non-custodial grandparent to make decisions regarding the care, custody, and control of a child

and, even if T.F. was living with Plaintiff at the time, there was no evidence he was actually

T.F.'s legal guardian, and (b) he cannot succeed on such a claim based upon a violation of his

First Amendment rights because he had no independent right to access school property, he was

afforded notice and an opportunity to be heard, and he did not pursue other avenues of addressing his concerns, such as a New York Article 78 proceeding.   (*Id.* at 14-16.)

Fourth, Defendants argue that Defendants School District and Board of Education cannot be held liable for the actions of the other Defendants because (a) Plaintiff has not raised any arguments regarding why Defendants Dee and Burgess should be considered policymakers for the District, (b) his allusion to the absence of a policy is insufficient to show that an official policy exists as required, and (c) he offers no support for his conclusory assertion that the relevant Defendants ratified or condoned the actions of the other Defendants.   (*Id.* at 17-18.)

Fifth, Defendants argue that Plaintiff has failed to show that Defendants Burgess and Redmond were personally involved in the alleged constitutional violations because he has offered no evidence to support his assertion that Defendant Redmond recommended that Plaintiff be banned from school events or that Defendant Burgess was even aware of any conflict between Plaintiff and Defendant Redmond at the time he issued the one-game ban or at the time Defendant Dee issued the longer ban.   (*Id.* at 18-19.)

Sixth, Defendants argue that they are entitled to qualified immunity on Plaintiff's claims because their conduct did not violate clearly established law, asserting specifically that *Johnson* does not clearly establish the law related to the set of circumstances present in this case.   (*Id.* at 19-20.)

## II.   LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A dispute of fact is "genuine" if "the [record] evidence

is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[6]   As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).   However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.   Fed. R. Civ. P. 56(a), (c), (e).[7]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that

---

[6]      As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].   As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[7]      Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 7.1(a)(3).

the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3).   What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[8]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[9]   Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See*

---

[8]     Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 56.1(b).

[9]     *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.   ANALYSIS

### A.   Whether Defendants Are Entitled to Summary Judgment on Plaintiff's First Amendment Claims

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law.   *See, supra* Parts I.D.1 and 3.   To those reasons, the Court adds the following analysis.

As was discussed above, Plaintiff has asserted two claims under the First Amendment: one alleging an abridgment of his right of assembly and one alleging retaliation for exercising his right to free speech.   (Dkt. No. 5, at ¶¶ 32-55.)

#### 1.   Right of Assembly

"The First Amendment prohibits the government from 'abridging the freedom of speech, or of the press,' and guarantees 'the right of the people to peaceably assemble.'"   *Johnson v. Perry*, 859 F.3d 156, 171 (2d Cir. 2017) (quoting U.S. Const. Amend. 1.)   Generally, "'government officials may stop or disperse public demonstrations or protests where *clear and present danger* of riot, disorder, interference with traffic upon the public streets, or *other immediate threat to public safety, peace, or order*, appears.'"   *Johnson*, 859 F.3d at 171 (*Papineau v. Parmley*, 465 F.3d 46, 56-57 [2d Cir. 2006]) (emphasis in original).   However, "'nothing in the Constitution requires the Government freely to grant access to all who wish to

exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities.'" *Johnson*, 859 F.3d at 171 (quoting *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 [1985]).   "Where there is no clear and present danger, 'speech restrictions imposed on [persons on] government-owned property are analyzed under a forum-based approach that divides government property into three [principal] categories–the traditional public forum, the designated public forum, and the nonpublic forum' . . . along with 'a subset of the designated public forum,' referred to as the 'limited public forum[.]'"   *Johnson*, 859 F.3d at 171 (quoting *Byrne v. Rutledge*, 623 F.3d 46, 53 [2d Cir. 2010]; citing *Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 625-26 [2d Cir. 2005]).   "In a limited public forum, regulations governing the content of speech are allowed, so long as they are 'reasonable' and 'viewpoint-neutral.'"   *Johnson*, 859 F.3d at 172.

The Second Circuit has specifically found that a gymnasium being used for interschool basketball games to which the public is invited constitutes as limited public forum.   *Johnson*, 859 F.3d at 175.   In such a forum, "unless there is a clear and present danger of disruptions such as disorder, riot, obstruction of the event, or immediate threat to public safety, the school may regulate access to the gymnasium when it is being used as a limited public forum only if its restrictions are reasonable and viewpoint-neutral."   *Johnson*, 859 F.3d at 175.

The Second Circuit's holding, which it states in various ways throughout its decision in *Johnson*, directly contradicts Plaintiff's argument that "in order to ban plaintiff [Defendants] must establish that he presented as a risk of 'clear and present danger of disruption or a threat to public safety.'"   (Dkt. No. 50, Attach. 1, at 5.)   Rather, again, even where no such clear and

32

present danger exists, a government actor may still restrict First Amendment rights in a limited

public forum where the restriction is reasonable and viewpoint-neutral.   *Johnson*, 859 F.3d at

175-76.   Because genuine disputes of fact almost certainly exist regarding whether Plaintiff's

conduct presented any clear and present danger of a qualifying disruption (given that there are

questions of fact as to what potentially threatening conduct Plaintiff actually engaged in), the

Court will put aside that portion of the test and instead assess whether there is any genuine

dispute of fact regarding whether Defendants' ban of Plaintiff from school events for the rest of

the relevant school year was both reasonable and viewpoint-neutral.

First, the Court finds that the evidence presented does not raise any genuine dispute of

material fact regarding the reasonableness of the restriction.   "In a limited public forum, the

reasonableness analysis turns on the particular purpose and characteristics of the forum and the

extent to which the restrictions on speech are 'reasonably related' to maintaining the

environment the government intended to create in that forum.'"   *Tyler v. City of Kingston*, 74

F.4th 57, 63 (2d Cir. 2023) (citing *Hotel Emps. & Rest. Emps. Union, Local 100 of New York,*

*N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 554

[2d Cir. 2002]).   "'[T]o survive First Amendment scrutiny[,] the restriction need not be the most

reasonable or the only reasonable limitation imaginable,' . . . but simply 'consistent with the

government's legitimate interest in preserving the property for the use to which it is lawfully

dedicated' . . . ."   *Tyler*, 74 F.4th at 63 (quoting *Byrne v. Rutledge*, 623 F.3d 46, 59 [2d Cir.

2010]; *Hotel Emps.*, 311 F.3d at 554).

Here, the forum was, as was already discussed, a school gymnasium for a high school

basketball game.   Conduct at such events by participants, school personnel, and spectators is

regulated by various District policies, as well as NYSPHSAA Guidelines, and Defendant Dee referred to such policies broadly and generally in his letter informing Plaintiff of the ban, stating that Plaintiff's conduct at the basketball game on January 24, 2022, "violated not only district policy, but *also Section II NYSPHSAA Guidelines for appropriate behavior*."   (Dkt. No. 42, Attach. 12, at 3 [emphasis added].)   NYSPHSAA Guideline 28 indicates that "[n]egative comments and inappropriate behaviors by spectators are required to be addressed by all and any school supervisors and administrators," which includes "[a]ny negative, inappropriate, derogatory comments or actions that draw the direct attention of a supervisor or school administrator."   (Dkt. No. 42, Attach. 32, at 47.)   This Guideline specifically allows for a spectator to "be prohibited from attending current and future interscholastic contests based on their behavior."   (*Id.*)

Plaintiff has not argued that the District's conduct policies or the NYSPHSAA Guidelines are themselves unconstitutional, or that adherence to such policies would not be "'consistent with the government's legitimate interest in preserving the property for the use to which it is lawfully dedicated.'"   *Tyler*, 74 F.4th at 63 (quoting *Byrne*, 623 F.3d at 59).   The use for which the forum was lawfully dedicated in this case is the playing of student basketball games or other sports contests, and Plaintiff does not raise any arguments that the Defendants lacked a legitimate interest in regulating conduct that could interfere with the well-being and safety of student players, personnel, and spectators attending such event.   The question is therefore whether, to the extent that some of Plaintiff's conduct is undisputed by the evidence, such conduct could have reasonably been interpreted by Defendant Dee in particular as being "negative, inappropriate, [or] derogatory" enough to warrant exclusion from future athletic

events pursuant to the NYSPHSAA Guidelines.[10]

Although Plaintiff states in his declaration that he "did not even raise my voice above that of the person I was speaking with" and that he did not yell or scream when talking to Matthew, the fact that he did raise his voice is nonetheless undisputed based on the video evidence, which clearly documents him raising his voice while standing within a few feet of Matthew and continuing to yell towards Matthew after he had walked toward the gymnasium exit, even if the words he said are difficult to understand.   (Dkt. No. 42, Exh. F, at 0:03:56-0:05:00; Dkt. No. 50, Attach. 2, at ¶ 2.)   The fact that Matthew may have also raised his voice in response to Plaintiff does not negate the fact that Plaintiff did, in fact, raise his voice, nor does it negate the fact that he continued to make comments to Matthew even after Matthew expressed a clear desire to end the conversation multiple times.   (*See* Dkt. No. 42, Exh. F.)   Further, although Plaintiff asserts that he "was a good 10 feet away" from Matthew during the encounter, the video evidence contradicts that assertion, showing instead that Plaintiff and Matthew were only a few feet apart during the first half of the encounter until Plaintiff walked away to leave the gymnasium.   (Dkt. No. 42, Exh. F.)   The video evidence further corroborates, through audio, that Plaintiff continued to wait outside the gymnasium doors despite being asked multiple times to wait further down the hall; Plaintiff himself admits that such a request was made but that he decided to stay where he was.   (Dkt. No. 42, Exh. F; Dkt. No. 50, Attach. 2, at ¶ 13.)   Further, as was discussed above in the Statement of Undisputed Material Facts, Plaintiff's own deposition testimony confirms that he used profanity while speaking with Matthew and making unflattering comments

---

[10]       The Court notes that, although Defendant Dee's letter prohibits Plaintiff from attending any school events (granted, he was permitted to be on campus for academic reasons concerning T.F. if he obtained the proper approval and followed procedure), Plaintiff does not allege or otherwise argue that he was actually prevented from attending any relevant events other than T.F.'s sports activities that he would have otherwise attended.   (Dkt. No. 5.)

about both Matthew and Defendant Redmond.   Thus, even if there are questions regarding whether Plaintiff made comments such as "I'll be in the parking lot" that could be directly construed as a threat of violence, Plaintiff's undisputed conduct reasonably could be considered to be negative, derogatory, or inappropriate for the setting, which, again, was a high school basketball game where students and parents were present.   No reasonable factfinder could conclude, based on the undisputed evidence, that Defendants' choice to exclude Plaintiff from school events for the remainder of the school year was unreasonable, particularly in light of the NYSPHAA Guidelines for spectator conduct.

Second, the Court finds that Plaintiff has not raised any genuine dispute of fact regarding whether the ban was viewpoint-neutral.   "[A] rule is neutral as to viewpoint if it is 'based only upon the manner in which the speakers transmit their messages . . . , and not upon the messages they carry.'"   *Tyler v. City of Kingston*, 593 F. Supp. 3d 27, 32 (N.D.N.Y. 2022) (Hurd, J.) (quoting *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 645 [1994]).   Although Plaintiff argues that the ban was intended to punish him for saying that Defendant Redmond was a bad coach, no reasonable factfinder could make such a conclusion from the evidence presented. Notably, although Plaintiff's response memorandum argues that the action was not viewpoint neutral because "defendant Redmond acted out of a motive to punish plaintiff for the content of his speech which is why he called the cops and why he reported a skewed version of what transpired to the School principal and superintendent," he has offered no evidence to support his belief that Defendant Redmond provided false information (as opposed to merely relaying information that was provided to him by Matthew and witnesses) or harbored animus towards him, much less that Defendant Redmond specifically recommended or was involved in the

decision to ban Plaintiff.   To the contrary, Defendant Redmond stated in his affidavit that "after

I forwarded the witness statements to Superintendent Dee and Principal Burgess, I had no further

involvement in this matter," and that he "was not involved" in either the making of the decision

to ban Plaintiff, nor in the writing of the letters that were sent to Plaintiff.   (Dkt. No. 42, Attach.

25, at ¶ 5-6.)   Nor does Plaintiff argue that Defendant Redmond's action of reporting Plaintiff's

actions to the police resulted in any independent violation of his constitutional rights.   (Dkt. No.

50, Attach. 1, at 7-8.)   Further, to the extent that Plaintiff asserts that Defendant Redmond

provided false information to Defendants Burgess and Dee in order to punish Plaintiff for the

content of his speech, the Court notes that the apparent content of what Defendant Redmond

reported to Defendant Dee (which was relayed to him by Matthew) is for the most part

corroborated by the multiple witness statements submitted regarding Plaintiff's behavior towards

Matthew during the relevant time, which included yelling at Matthew, insulting Matthew and

Defendant Redmond, and refusing to leave when asked by multiple people.   (Dkt. No. 42,

Attachs. 15, 16, 17, 18; Dkt. No. 42, Attach. 25, at ¶¶ 4-5.)   Put simply, Plaintiff has not

provided any evidence to raise a genuine dispute of fact regarding whether any animus or

personal dislike by Defendant Redmond might have contributed to his ban; such an inference is

unsupported by any evidence.

        The letter sent to Plaintiff by Defendant Dee informing him of the ban for the remainder

of the school year (which was dated January 26, 2022, only two days after the incident

happened) cites the fact that Plaintiff's conduct was found to violate district policy as well as

NYSPHSAA Guidelines related to appropriate behavior.   (Dkt. No. 42, Attach. 12, at 3.)   As

was discussed above, that behavior, to the extent it can be said to be undisputed on the record

before the Court, was reasonably construed by Defendants as being inappropriate in violation of the NYSPHSAA Guidelines.   The letter does indicate that Defendant Dee was aware that Plaintiff made comments complaining about Defendant Redmond, but also indicates that, apart from the substance of the comments themselves, Plaintiff "approached a district staff yelling at him and cursing the individual out" and "continued to accost the staff member" even after that staff member "repeatedly told you that you should discuss your concerns with the coach."   (Dkt. No. 42, Attach. 12, at 3.)   Plaintiff has offered nothing but his own speculation that the true basis of Defendants' ban was his expressed viewpoint about Defendant Redmond's coaching abilities rather than the nature of the words and actions through which he communicated that viewpoint.

Based on the evidence presented, no reasonable factfinder could conclude from the undisputed evidence that Plaintiff's ban from school events for the rest of the relevant school year was based on the viewpoints that he expressed about Defendant Redmond both at the game and in any subsequent conversations with Defendant Burgess rather than the conduct he displayed following the basketball game on January 24, 2022.   As a result, Plaintiff's claim for a violation of his First Amendment right of assembly cannot succeed, and the Court grants summary judgment on that claim to Defendants.

### 2.     Retaliation for Speech

"'[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech."   *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 [2006]).   "To establish a *prima facie* First Amendment retaliation claim, a plaintiff must show (1) 'that the speech or conduct at issue

was protected' from the particular retaliatory act alleged; (2) that the retaliatory act qualified as an 'adverse action [taken] against the plaintiff'; and (3) 'that there was a causal connection between the protected speech and the adverse action.'"   *Heim v. Daniel*, 81 F.4th 212, 221 (2d Cir. 2023) (quoting *Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 82 [2d Cir. 2022]).

If a plaintiff establishes a *prima facie* case of retaliation, "a government defendant may still receive summary judgment if it establishes its entitlement to a relevant defense.'"   *Heim*, 81 F.4th at 221 (quoting *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 [2d Cir. 2011]).   The Supreme Court has indicated that First Amendment retaliation claims require a showing of "'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."   *Nieves*, 139 S. Ct. at 1722; *accord Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 47 (2022).   The government bears the burden of showing that it "would have taken the challenged action even without the impermissible motive." *Nieves*, 139 S. Ct. at 1722 (citing *Hartman*, 547 U.S. at 260).

Defendants do not appear to contest that Plaintiff's comments about Defendant Redmond could constitute protected activity, nor that he suffered an adverse action.   (Dkt. No. 42, Attach. 1, at 22-23.)   The relevant issue appears to be whether there was a causal connection between those comments and his ban from school events for the remainder of the school year.

In terms of causation, it is undisputed that the ban on attendance at school events was imposed within days of the statements Plaintiff made about Defendant Redmond's coaching abilities.   However, even if such close temporal proximity might be enough to raise an inference of improper motive sufficient to sustain a *prima facie* case, such fact does not mean that the analysis ends there.   Specifically, as has been stated most clearly in the government employment

context, a government defendant may still be entitled to summary judgment despite a plaintiff's

ability to show a *prima facie* case of First Amendment retaliation if it can be "demonstrated by a

preponderance of the evidence that that [the defendant] would have taken the same adverse . . .

action even in the absence of protected conduct."   *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 119

(2d Cir. 2015) (internal quotation marks omitted); *accord Heim v. Daniel*, 81 F.4th 212, 222 (2d

Cir. 2023).   Defendants have sufficiently shown as much here, for many of the same reasons

discussed above related to Plaintiff's freedom-of-assembly claim: disputed facts about Plaintiff's

exact words notwithstanding, the evidence related to his conduct that is undisputed shows that

Defendants had a reasonable basis for their decision to exclude Plaintiff from school events to

the extent that such conduct reasonably could be interpreted as violating NYSPHSAA spectator

conduct guidelines; and there is no evidence other than Plaintiff's speculative assertions of

improper motive to contradict Defendants' proffered evidence denying that they were in any way

motivated in their actions by Plaintiff's statements about Defendant Redmond's coaching

abilities.   The Court therefore finds that Defendants have sufficiently shown that, other issues of

fact aside, it is undisputed that they would have made the same decision even in the absence of

Plaintiff's allegedly protected speech, and Plaintiff's claim therefore cannot succeed.

For the above reasons, the Court also grants summary judgment to Defendants on

Plaintiff's claim for retaliation pursuant to the First Amendment.

> ### B.   Whether Defendants Are Entitled to Summary Judgment on Plaintiff's Fourteenth Amendment Claim

After careful consideration, the Court answers this question in the affirmative for the

reasons stated in Defendants' memoranda of law.   *See, supra* Parts I.D.1 and 3.   To those

reasons, the Court adds the following analysis.

The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process."   U.S. Const. Amend. XIV, § 1.   As relevant to this case, the procedural component of this prohibition "applies where there is an alleged deprivation by government action of a constitutionally protected interest without sufficient procedural safeguards, such as notice and a hearing."   *Potrzeba v. Sherburne-Earlville High School through Sherburne-Earlville Cent. Sch. Dist. Bd. of Educ.*, 23-CV-0191, 2023 WL 8827178, at *9 (N.D.N.Y. Dec. 21, 2023) (Sannes, C.J.) (citing *Zinermon v. Burch*, 494 U.S. 113, 125 [1990]). "To state a claim for violation of procedural due process under § 1983, a plaintiff must plausibly allege '(1) that he [or she] possessed a protected liberty or property interest; and (2) that he [or she] was deprived of that interest without due process.'"   *Potrzeba*, 2023 WL 8827178, at *9 (quoting *Rehman v. State Univ. of New York at Stony Brook*, 596 F. Supp. 2d 643, 656 [E.D.N.Y. 2009]).

The first question is therefore whether Plaintiff possessed a constitutionally protected liberty interest here.   As an initial matter, Plaintiff does not appear to dispute Defendants' argument that there is no general constitutionally protected liberty interest in an ability to access school property, and therefore the Court will not discuss that well-supported point in any detail. Instead, the Court will focus on whether Plaintiff, as a grandparent, possesses a recognized liberty interest related to attending athletic events for his grandchild.   As Defendants highlight, this Court has somewhat recently held that non-custodial grandparents do not possess a constitutional right to visitation with a grandchild.   *Drawbridge v. Schenectady Cnty. Dept. of Soc. Servs.*, 21-CV-0117, 2023 WL 4888599, at *2 (N.D.N.Y. Aug. 1, 2023) (Scullin, J.) (collecting cases).   Although Plaintiff has asserted that T.F. lived with him and his wife during

the relevant school year, he testified somewhat confusingly at his deposition that T.F. had "been

with my son," but then was living with his mother after Plaintiff's son moved during T.F.'s

sophomore year of high school, and then began to live with Plaintiff at some point thereafter.

(Dkt. No. 5, at ¶ 20; Dkt. No. 42, Attach. 4, at 3.)   Given that the parties do not seem to have

raised any dispute about whether T.F. lived with Plaintiff at the relevant time, the Court will

assume that is true for the purposes of this motion.   However, the fact that T.F. lived with

Plaintiff does not inherently mean that Plaintiff was T.F.'s legal custodial guardian, and he has

not presented any evidence or indeed even any argument to support such finding.

     Instead, Plaintiff argues that this Court should recognize a liberty interest in a

grandparent's interest generally (and more so where the grandchild lives with the grandparent) in

the relationship with their grandchild.   However, apart from a single out-of-circuit case that was

decided nearly fifty years ago, Plaintiff points to no authority to support that argument.   As

highlighted by *Drawbridge*, more recent and relevant assessments by courts within the Second

Circuit of the liberty interests of grandparents to have even visitation with grandchildren have

found that no such interest is present in the Constitution, and if there is no right to visitation,

there certainly would be no basis to find a right to attend a grandchild's school events.   It is also

important to note that there is no evidence that Plaintiff is T.F.'s legal guardian and Plaintiff has

not been prevented by any government actor from having T.F. live with him or from otherwise

interacting or having a relationship with T.F.; he alleges only that he was unable to attend school

events, some of which T.F. would be participating in, which makes this case distinguishable

from those such as *Bellet v. City of Buffalo*, 03-CV-0027, 2009 WL 2930464, at *4 (W.D.N.Y.

Sept. 11, 2009), in which the court there found that a grandparent who lives with a grandchild

and "for all intents and purposes . . . acted as the grandson's parent" after both biological parents surrendered custody, may possess a liberty interest in that relationship.

In any event, even assuming Plaintiff could show that he possesses a relevant liberty interest in attending T.F.'s school events, the Court need not decide whether the process Defendants provided in this instance was constitutionally sufficient because Defendants are entitled to qualified immunity.   This is fortunate for the Defendants because the circumstances of this case raise some troubling questions about the School District's procedures (or lack thereof) for providing due process related to banning community members from school grounds. From the evidence presented, it does not appear that Defendants offered Plaintiff any meaningful process other than informing him that he could call Defendant Dee (who, as the Superintendent, was the individual responsible for making the decision to implement the ban), but when Plaintiff attempted to call Defendant Dee, Defendant Dee did not return his calls or speak to him about the ban.   As a result, the lack of meaningful effort by Defendant Dee to even have a phone conversation with Plaintiff raises some concerns about whether Defendants would provide sufficient process in a case where it was required.

Nevertheless, the Court finds that Defendants are entitled to qualified immunity on this claim because it was not clearly established at the relevant time that Defendants were required to provide Plaintiff with due process under the circumstances presented.   Although it was certainly clearly established that a government official must provide due process, such as in the usual form of notice and a hearing, before depriving an individual of their relevant constitutional rights, that analysis requires that the official have a basis for knowing that he or she, is in fact, violating a right and is therefore required to provide due process.   As was discussed above, there is

significant uncertainty in the case law as to when a grandparent, even one with whom a grandchild is living, has a liberty interest in their relationship with their grandchild at all, much less specifically in the ability to attend that grandchild's school-based extracurricular activities. Because such a right was not clearly established by a precedent of either the Second Circuit or the Supreme Court at the time of the relevant actions, Defendants are entitled to qualified immunity as to Plaintiff's Due Process claim.

> C.      **Defendant's Remaining Arguments**

Because the Court finds that all of Plaintiff's claims must be dismissed, it declines to address the other arguments Defendants have raised related to the liability of individual Defendants based on lack of personal involvement or a government policy under *Monell*, or regarding the defense of qualified immunity related to Plaintiff's First Amendment claims.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 42) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's Supplemental Complaint (Dkt. No. 5) is **<u>DISMISSED</u>**.

Dated:  July 11, 2024
         Syracuse, New York


Glenn T. Suddaby
U.S. District Judge